# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

JENNER BENAVIDES, et al.,

    Plaintiffs/Petitioners,

v.

PATRICK GARTLAND, et al.,

    Defendants/Respondents.

No. 5:20-cv-46

**ORDER**

This matter is before the Court on a motion by Plaintiff/Petitioners Jenner Benavides, David Fernandez, and Gerardo Arriaga (collectively "Petitioners"), proceeding under pseudonyms, for a Temporary Restraining Order and Emergency Writ of Habeas Corpus. Dkt. No. 4.[1] The motion has been fully briefed. Additionally, the Court held a hearing on April 15, 2020 during which the parties were afforded opportunities to present argument and evidence to the Court. Petitioners are civil detainees at the United States Immigration and Custom Enforcement ("ICE") Processing Center in Folkston, Georgia (the "Folkston Facility"). They allege to have medical conditions that would increase their risk of permanent injury or death if they were to contract COVID-

---

[1] Because Respondents have already been notified of Petitioners' motion and given an opportunity to respond, the Court will address the motion as one for a preliminary injunction. See Fed. R. Civ. P. 65.

19, a respiratory illness spread by a novel Coronavirus that is proliferating throughout the United States and the rest of the world. They further allege that the conditions at the Folkston Facility have made them uniquely susceptible to contracting COVID-19. Accordingly, they ask for "emergency release through a writ of habeas corpus or, alternatively, through injunctive relief under Rule 65." Dkt. No. 4-1 at 15. For the reasons discussed below, the Court finds that Petitioners have not shown that they are likely to prevail on their underlying claims and will therefore **DENY** their motion for preliminary relief.

## BACKGROUND

The first outbreak of the virus causing COVID-19 is believed to have originated in late 2019 in Wuhan, China.[2] Within months, the World Health Organization ("WHO") declared COVID-19 to be a pandemic.[3] In February 2020, community transmission of Coronavirus was detected in the United States.[4] Since then, the virus has

---

[2] See Lauren Gardner, Johns Hopkins Whiting School of Engineering, *Mapping 2019-nCOV*, available at https://systems.jhu.edu/research/public-health/ncov/ (last accessed Apr. 17, 2020); see also Centers for Disease Control and Prevention, *CDC Newsroom*, available at https://www.cdc.gov/media/dpk/diseases-and-conditions/coronavirus/coronavirus-2020.html (last accessed Apr. 17, 2020).
[3] See WHO, *WHO Director-General's Opening remarks at the media briefing on COVID-19*, March 11, 2020, available at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last accessed Apr. 17, 2020).
[4] CDC, *Morbidity and Mortality Weekly Report*, April 17, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e4.htm?s_cid=mm6915e4_w (last accessed Apr. 17, 2020).

continued to spread rapidly, infecting hundreds of thousands of people in this country as of the writing of this opinion.[5]

To date, there is no known vaccine to protect against COVID-19, nor is there an antiviral treatment for those who are infected.[6] Instead, the most effective approach to minimizing fallout from the disease is to stay clean and to avoid contact with others. Specifically, the CDC recommends, inter alia, frequent hand-washing, avoiding close contact with others, using face coverings while in public, and cleaning and disinfecting frequently touched surfaces.[7]

Symptoms from exposure to Coronavirus range from mild cold-like symptoms to severe respiratory distress and even death.[8] Though relatively little is known about the risk factors for COVID-19, preliminary data suggests that older adults and individuals with certain underlying medical conditions are most susceptible to developing serious medical complications from the infection.[9] Conditions that might increase the risk of death or permanent

---

[5] Johns Hopkins University & Medicine, *Coronavirus Resource Center*, available at https://coronavirus.jhu.edu/map.html (last accessed Apr. 17, 2020).
[6] See WHO, *Q&A on coronaviruses (COVID-19)*, available at https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last accessed Apr. 17, 2020); see also Dkt. No. 4-3 at 3.
[7] CDC, *Coronavirus Disease 2019, Protect Yourself*, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed Apr. 17, 2020).
[8] See CDC, *Coronavirus Disease 2019*, *Symptoms*, available at https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed Apr. 17, 2020).
[9] CDC, *Coronavirus Disease 2019*, *People Who Are At Higher Risk*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed Apr. 17, 2020).

3

injury from COVID-19 include, but are not limited to, chronic lung disease, severe obesity, diabetes, liver disease, serious heart conditions, and other conditions that compromise the immune system, such as HIV or AIDS.[10]

Petitioners each allege that they have conditions that are believed to increase their risk of complications if exposed to COVID-19. Petitioner Benavides is a twenty-seven year-old transgender detainee who has been in ICE custody since approximately May 2019. Dkt. No. 4-9 ¶¶ 2-3. Benavides purports to have been diagnosed with HIV in 2015 and high cholesterol in 2019. Id. ¶¶ 6, 11. She also reports occasional high blood pressure and suffers from certain psychological conditions, including bipolar disorder and severe depression. Id. ¶ 11. Benavides is currently on medication for each of these conditions and receives treatment from healthcare providers for HIV and the mental health conditions. Id. ¶¶ 12, 14.

Petitioner Fernandez is forty-five years old and has been detained since approximately December 2019. Dkt. No. 4-10 ¶¶ 2,5. He was diagnosed with diabetes approximately three years ago and suffered from Tuberculosis approximately ten years prior to that. Id. ¶ 6. Fernandez alleges that since his time at the Folkston Facility, his health has deteriorated. Id. ¶ 8. He indicated that

---

[10] Id.

4

he is not able to get enough insulin injections to treat his condition and sometimes fears he is at risk of a heart attack. Id.

Finally, Petitioner Gerardo Arriaga is a twenty-four year-old detainee who has been in the Folkston facility since March 2020. Dkt. No. 4-11 ¶¶ 2-3. He indicates that when he was seventeen, he was diagnosed with Lupus, an autoimmune disease that causes inflammation, swelling, and damage to his joints, skin, kidneys, blood, heart, bones, and lungs. Id. ¶ 5. He also indicated that Lupus predisposes him to "all types" of infections and that he needs medication to manage his symptoms. Id.

Petitioners allege that the conditions at the Folkston Facility increase their risk of contracting COVID-19. First, they contend that the facility has not taken adequate measures to protect against infected individuals entering the facility. They contend that staff and other visitors are permitted to come and go from the facility without adequate screening and are not required to wear any sort of personal protective equipment. Dkt. No. 4-1 at 9-10. They also allege that despite the lack of screening, ICE continues to arrest and bring in new detainees while also transferring current detainees among facilities. Id. Petitioners point to a recent incident whereby detainees from a facility in Florida apparently had been moved to the Folkston Facility despite having been previously exposed to COVID-19 See Dkt. No. 30-2 ¶ 5.

5

Second, Petitioners allege that the Folkston Facility lacks adequate hygiene and sanitation practices. Specifically, they contend that the facility uses shared living, eating, and recreation spaces and that Petitioners lack access to soap and cleaning materials. Dkt. No. 4-1 at 10-11. For example, Fernandez alleged in his declaration that detainees are only given small bags of soap each week to wash their hands and bodies and that there is no hand sanitizer available in either the commissary or the facility as a whole. Dkt. No. 4-10 ¶¶ 15-16. Similarly, Benavides alleges that the only soap available for washing and showering are single-use packets that are handed out inconsistently. Dkt. No. 4-9 ¶ 24. Benavides also contends that while detained people who serve food and clean common areas are given gloves, they are not offered face masks or other personal protective equipment. Id. ¶ 26. They are also not instructed to clean the doors or doorknobs. Id. ¶ 27.

Third, Petitioners allege that so-called "social distancing" measures recommended by health officials to prevent the spread of COVID-19 are impossible at the Folkston Facility. They contend that detained people live close together, often in shared dorms. Dkt. No. 4-1 at 11. Specifically, Arriaga stated that the cells detainees share with another roommate contain bunk beds that are no more than two feet apart and that detainees in the common areas are also close together. Dkt. No. 4-11 ¶ 6. To eat, Arriaga alleges

6

that they all go to the cafeteria and sit in close proximity to one another. Id. ¶ 7. He acknowledges that this practice has changed recently such that food is given out in boxes. Id.

At least one of the Petitioners—Benavides—alleges that she has been placed in isolation and will remain there for the duration. See Dkt. No. 4-9 at 6-7. However, Benavides alleges that being shut in the small space exacerbates her anxiety and depression. Moreover, Petitioners' medical experts have stated in declarations that isolation is not sufficient to prevent the spread and advancement of COVID-19 because isolated individuals are monitored less frequently and could come in contact with guards more regularly due to the need to be escorted around the facility. See Dkt. No.4-3 ¶ 22; see also Dkt. No. 4-4 ¶ 20; see also Dkt. No. 4-5 ¶ 8. Petitioners also contend that isolation increases the risk of psychological conditions and symptoms. See Dkt. No. 4-2 ¶ 22.

Finally, Petitioners argue that the location of the Folkston Facility makes Petitioners uniquely susceptible to harm if they were to contract COVID-19. They allege that Folkston is geographically isolated from medical facilities that are adequately equipped to handle the disease. Specifically, they contend that the nearest hospital with ICU capabilities is approximately 26 miles away. Dkt. No. 4-1 at 13. They note that patients would likely need to be transferred to a hospital in

Brunswick, Georgia which is about 45 miles away. Id. Petitioners allege that the Folkston facility itself is not adequately equipped to address medical emergencies and disease outbreaks. Id. at 12.

Ultimately, Petitioners argue that an outbreak of COVID-19 at the Folkston facility is imminent. Given what they contend are inadequate measures at the Folkston Facility to prevent the spread of the disease and the Petitioners' unique susceptibility to harm if they were to contract it, Petitioners urge the Court to order their immediate release.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic" remedy. Siegel v. LePore, 234 F.3d 1163, 1176-77 (11th Cir. 2000). Indeed, "[w]hen a court employs the extraordinary remedy of injunction it directs the conduct of a party, and does so with the backing of its full coercive powers." Nken v. Holder, 556 U.S. 418, 428 (2009) (internal quotations and citations omitted). A court should only exercise this power in the rarest of circumstances. For the court to grant such extraordinary relief, a movant must establish four essential elements: (1) a likelihood of success on the merits of the overall case; (2) irreparable injury; (3) the threatened injury outweighs the harm the preliminary injunction would cause the other litigants; and (4) the preliminary injunction would not be averse to the public interest. See Chavez v. Fla. SP Warden, 742 F.3d 1267, 1271 (11th

Cir. 2014). An injunction is "not to be granted unless the movant clearly establish[es] the burden of persuasion as to all four elements." CBS Broad v. Echostar Communs. Corp., 265 F.3d 1193, 1200 (11th Cir. 2001) (internal quotations omitted). Moreover, injunctions that do more than preserve the status quo are particularly disfavored. Powers v. Sec'y, Fla. Dep't of Corr., 691 F. App'x 581, 583 (11th Cir. 2017) (internal quotations and citation omitted).

## DISCUSSION

Even assuming the truth of Petitioners' factual contentions, the Court finds that Petitioners have failed to establish a likelihood of success on their claims because they have simply not stated a cognizable legal basis for release from confinement. Petitioners assert two legal grounds for relief. First, Petitioners contend that Courts have "broad power under Rule 65 to fashion equitable remedies to address constitutional violations in prisons." Dkt. No. 4-1 at 15. Though this contention is somewhat vague, Petitioners seem to argue that Rule 65 creates a cause of action under which claimants may seek relief. This argument is without merit.

It is well-settled that for Petitioners to be entitled to relief under Rule 65, they must tether their request for relief to a cause of action set forth in their pleading. See Fra. S.P.A. v. Surg-O-Flex of Am. Inc., 415 F. Supp. 421, 426 (S.D.N.Y. 1976)

(stating that Rule 65 "is a mechanism to secure provisional relief for an underlying claim in extraordinary circumstances" but that it "does not introduce an independent cause of action"); see also Adelman v. Rheem Mfg. Co., No. 2:15-cv-190, 2015 U.S. Dist. LEXIS 107265, at *23 (D. Ariz. Aug. 14, 2015) ("[I]t is well-settled that a claim for 'injunctive relief, standing alone, is not a cause of action."); see also Alabama v. United States Army Corps of Eng'rs, 424 F.3d 1117, 1134 (11th Cir. 2005) ("[I]njunctive relief must relate in some fashion to the relief requested in the complaint."). Indeed, the 'likelihood of success' prong itself suggests that Rule 65 does not operate as an independent mechanism of relief because the movants are required to show "a substantial likelihood of prevailing on at least one *of the causes of action [they have] asserted*." Alabama, 424 F.3d at 1134 (emphasis added). Since Rule 65 is not a standalone basis upon which a petitioner can bring a constitutional claim, the Court finds that Petitioners are not likely to succeed on the merits of any claim predicated only on Rule 65.

Petitioners argue in the alternative that they are entitled to relief via a writ of habeas corpus under 28 U.S.C. § 2241. This argument also fails. Petitioners constitutional challenges to their confinement are ultimately objections to their conditions of confinement. Though circuit courts are divided on whether habeas is the appropriate mechanism for challenging conditions of

10

confinement, the weight of authority in the Eleventh Circuit is that it is not. See Gomez v. United States, 899 F.2d 1124, 1126 (11th Cir. 1990) ("If these claims are considered in a habeas corpus context, however, this Court has held that even if a prisoner proves an allegation of mistreatment in prison that amounts to cruel and unusual punishment, he is not entitled to release."); Vaz v. Skinner, 634 Fed. App'x 778, 780 (11th Cir. 2015) ("Claims challenging the fact or duration of a sentence fall within the 'core' of habeas corpus, while claims challenging the conditions of confinement fall outside of habeas corpus law."); Cook v. Baker, 139 Fed. App'x 167, 168 (11th Cir. 2005) (holding similarly to Vaz); Daker v. Warden, No. 18-cv-14984, 2020 U.S. App. LEXIS 4764, at *2 (11th Cir. 2020) (holding similarly to Vaz); A.S.M. v. Donahue, No. 7:20-cv-62, 2020 U.S. Dist. LEXIS 65226, at *2, 4 (M.D. Ga. Apr. 10, 2020) (finding that habeas "is not the appropriate mechanism" for the ICE detainee petitioner's request for release from confinement due to COVID-19). Instead, the proper vehicle for bringing such claims is a civil rights action, such as under Bivens v. Six Unknown Named Agents, 403 U.S. 688 or 42 U.S.C. § 1983. See Hampton v. Fed. Corr. Inst., NO. 1:09-cv-00854, 2009 U.S. Dist. LEXIS 52368, at *5 (N.D. Ga. 2009) ("[T]he proper vehicle for a prisoner to challenge his conditions of confinement is a civil rights, rather than a habeas corpus, action.") (citing McKinnis v. Mosely, 693 F.2d 1054, 1056-57) (11th Cir. 1982)).

However, Petitioners insisted at the April 15 hearing that their action is not one under Bivens.

Instead, Petitioners contend that habeas actions can be used to challenge a detainee's conditions of confinement where there are no other means of relief to remedy the conditions other than release. Assuming, without deciding, that this is a correct statement of the law, the Court finds that Petitioners have not shown a likelihood of success on such a claim. Indeed, the conditions in the Folkston Facility that Petitioners allege contribute to an increased risk of the spread of COVID-19—assuming these claims are true—could be remedied with internal facility changes, such as more vigilant screening measures, increased availability of cleaning supplies, and greater efforts to create distance between detainees. Petitioners' expert, Robert B. Greifinger, M.D., urges that some of the available measures, such as solitary confinement for vulnerable detainees, would not be effective because the facility might not adequately implement solitary confinement procedures. However, testimony that changed conditions might be inadequately implemented proves too much. At bottom, Petitioners have not shown a likelihood of success in proving that release is the only means of remedying the conditions of which they complain. Moreover, even to the extent that some aspects of detention necessarily increase the risk of exposure to contagious diseases, the Constitution does not require that

12

detention facilities reduce the risk of harm to zero. See Williams v. Scibana, No. 04-C-349-C, 2004 U.S. Dist. LEXIS 15548, at *10 (W.D. Wis. Aug. 3, 2004) ("Although the Fifth Amendment's due process clause provides federal inmates with certain minimum procedural safeguards, it does not create a right to procedural perfection."). Indeed, even if detainees were released, they—like all people—would still face some risk of exposure to COVID-19.

## CONCLUSION

The Court is sympathetic to the plight of Petitioners, but they have not shown that the form of remedy they seek—complete release—is appropriate. The evidence put forth thus far does not establish a likelihood of success in proving that release is the only way to remedy the conditions. For the reasons above, the Court finds that Petitioners have failed to show a likelihood of success on the merits of any claim that would entitle them to release. Therefore, the Court **DENIES** their motion for preliminary relief. As the Court in A.S.M. v. Donahue did, this Court emphasizes the narrow reach of this Order. It does not mean that Petitioners could not eventually prevail, just that the credible evidence brought forth thus far does not show that they are likely to do so.

**SO ORDERED**, this 18th day of April, 2020.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA