# In the United States District Court
# for the Southern District of Georgia
# Waycross Division



FILED
John E. Triplett, Acting Clerk
United States District Court

By CAsbell at 4:45 pm, Jul 08, 2020

JENNER BENAVIDES, DAVID
FERNANDEZ, GERARDO ARRIAGA,
AJIT JUMAR, SCOTT JAMES, and
WINSTON BROWN,

  Plaintiffs/Petitioners,

  v.

PATRICK GARTLAND, THOMAS GILES,
MATTHEW T. ALBENCE, and CHAD
WOLF,

  Defendants/Respondents.

No. 5:20-cv-46

## ORDER

This matter is before the Court on a second motion by Plaintiffs/Petitioners ("Petitioners") seeking a preliminary injunction and emergency habeas relief. Petitioners are civil detainees at the United States Immigration and Custom Enforcement ("ICE") Processing Center in Folkston, Georgia (the "Folkston Facility"). In their original motion (the "First Injunction Motion") Petitioners sought release from confinement from the Folkston Facility based on their risk of exposure—and their unique vulnerability to—COVID-19, a respiratory illness spread by a novel Coronavirus. On April 18, 2020, this Court denied the First Injunction Motion (the "April Order") finding that habeas relief

is not available to detainees seeking release from detention based on claims about conditions of confinement. Instead, the Court found, in part, that the proper vehicle for challenging unlawful conditions of confinement is a civil rights action, such as those brought under Bivens v. Six Unknown Named Agents, 403 U.S. 688 or 42 U.S.C. § 1983.

On May 8, 2020, Petitioners filed an amended pleading followed by a second Motion for Preliminary Injunction and Emergency Habeas Relief (the "Second Injunction Motion") whereby they again seek release from the Folkston Facility. In the alternative, Petitioners ask for an order requiring Respondents to take certain actions to reduce their risk of exposure to COVID-19, including, inter alia, complying with guidelines issued by the Centers for Disease Control and Prevention ("CDC"). The Second Injunction Motion has been fully briefed and is ripe for review. Furthermore, on June 9, 2020, this Court held a hearing during which the parties were afforded an additional opportunity to present arguments to the Court. For the reasons below, the Court finds that the Second Injunction Motion should be **DENIED.**

BACKGROUND

Most of the pertinent facts and procedural history are set forth in detail in this Court's April Order. In their amended pleading, Petitioners added new parties as petitioners to their Petition/Complaint. Without dissertating on the details of these

2

new Petitioners, the Court will accept as true that the new parties are detainees at the Folkston Facility who are uniquely vulnerable to permanent injury or death if exposed to COVID-19.[1] The Primary new and relevant facts in the Second Injunction Motion concern allegations that Respondents are failing to adequately protect Petitioners from COVID-19 by failing to adhere to ICE's 2011 Performance-Based National Detention Standards ("PBNDS") and the CDC's "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." ("CDC Guidance")[2]. Specifically, Petitioners allege that under PBNDS, Respondents are required, inter alia, to comply with CDC Guidance on managing the spread of COVID-19 in detention facilities. Relying largely on Petitioners' declarations describing conditions in the Folkston Facility, Petitioners outline a series of ways in which Respondents have allegedly failed to comply with CDC Guidance.

First, Petitioners contend that CDC Guidance recommends individuals maintain six feet of distance from one another regardless of whether they are experiencing symptoms. Dkt. No. 41-1 at 7. Petitioners allege that Respondents "cannot possibly

---

[1] Petitioners concede that Gerardo Arriaga, a Petitioner in the First Injunction Motion, and Ajit Kumar, a new Petitioner, have been transferred to a different facility, effectively mooting their claims for injunctive relief. See Dkt. No. 74 at 16. The parties dispute, however, whether the Court retains jurisdiction over Arriaga and Kumar's underlying claims. See id. The Court need not reach a decision on the latter issue at this stage. Instead, it simply finds that Arriaga and Kumar's claims for injunctive relief are moot.
[2] Available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

implement" this practice at the Folkston Facility given that detainees live and eat in close quarters, share showers and toilets, and line up close to one another to go to the cafeteria and other places. Id. at 8-9.

Second, Petitioners allege that CDC Guidance requires "intensified cleaning and disinfecting procedures" such as cleaning frequently touched surfaces and lifting restrictions on undiluted disinfectants. Id. at 9 (quoting CDC Guidance at 9). The CDC also recommends taking precautions while using these products, such as wearing gloves and ensuring proper ventilation. Id. at 9-10. Petitioners contend that detainees at the Folkston Facility are responsible for cleaning their own living spaces and common areas but are not offered adequate cleaning supplies, gloves or facemasks. Id. at 10. Cleaning solutions are also often diluted or otherwise inadequate. Id.

Third, Petitioners allege that CDC Guidance requires detention facilities to stop transferring detainees between facilities unless "necessary," in which case specific measures should be taken to screen, isolate, or quarantine new intakes. Id. (citing CDC Guidance at 14). Petitioners cite to observations by detainees that new detainees have been moved in and out of the Folkston Facility throughout the previous month and that "based on the limited information available to Petitioners," Respondents

4

have not complied with CDC Guidance on screening, isolating, and quarantining new intakes. Id. at 10-11.

Fourth, Petitioners allege that CDC Guidance requires Respondents to "post signage throughout Folkston regarding COVID-19 symptoms, risk mitigation practices, and instructions to report symptoms to staff." Id. at 12. The guidance also requires "ongoing communication with detained people about risk reduction and COVID-19 transmission in the facilities." Id. Petitioners allege that ICE has never informed them about COVID-19 nor recommended hygiene or social distancing practices. Id. They further allege that when they ask about COVID-19, Folkston personnel threaten to take away possessions or place them in solitary confinement. Id. Moreover, Petitioners contend that, contrary to CDC Guidance, notices about COVID-19 are sometimes offered only in English, which some Petitioners cannot understand. Id.

Fifth, Petitioners point to CDC Guidance about when symptoms develop, in which case detainees are to wear a face mask, be placed in medical isolation, and receive immediate medical evaluation and treatment. Id. at 13. If facilities cannot quarantine detainees individually, the CDC has stated that "cohorting," or quarantining as a group, is acceptable so long as separate cohorts are established for confirmed cases, suspected cases, and close contact cases. Id. at 13. Contrary to this guidance, Petitioners allege that Respondents "routinely ignore reports of COVID-19

symptoms" at the Folkston Facility and that symptomatic individuals remain in the general population without being seen by medical staff. Id.

Finally, Petitioners point to a series of miscellaneous deficiencies at the Folkston Facility that they contend violate CDC guidelines. These include: 1) limited access to soap and hand sanitizer, 2) limited access to and limited use of personal protective equipment ("PPE") by detainees and staff, respectively, 3) inadequate screening measures for people entering the Folkston Facility, and 4) generally inadequate medical care. Id. at 14-15.

Petitioners allege that on May 4, 2020, a few weeks after this Court denied the First Injunction Motion, ICE publicly confirmed the first known case of COVID-19 at the Folkston Facility. Id. at 2. This, according to Petitioners, obligates Respondents to respond in accordance with CDC guidance, including quarantines and screening. Id. at 15-16. Petitioners argue that the best way to mitigate the spread of COVID-19 at the Folkston Facility is to release vulnerable detainees. Id. at 17. Nevertheless, they assert that "[a]t a minimum" the Court should order "strict compliance with CDC Guidance" while the Court considers the merits of their case. Id.

Respondents deny that the Folkston Facility is failing to conform to CDC Guidance and identify several measures being taken to help reduce the spread of COVID-19. Specifically, Respondents

contend that detainees entering the facility undergo medical screenings during which they are assessed for certain symptoms of COVID-19 and questioned about possible exposure. See Dkt. No. 69-1 ¶ 17; see also 69-2 ¶ 17. Detainees with symptoms are placed in isolation and tested for the disease; those who test positive are isolated and treated accordingly. Dkt. No. 69-1 ¶ 18; see also Dkt. No. 69-2 ¶ 18. All other detainees are placed in cohorts for a fourteen-day quarantine. Dkt. No. 69-2 ¶ 19; see also Dkt. No. 69-1 ¶ 19. Respondents contend that social visits to the Folkston Facility have been suspended and that "essential visitors," such as attorneys, are required to undergo screening. See Dkt. No.69-2 ¶¶ 9-11. Those deemed to pose a risk to staff or detainees are denied entry, and those who are allowed to enter are required to wear PPE. Id. ¶¶ 10, 13.

Respondents contend that protective measures are also being taken within the Folkston Facility itself. In support, they cite to declarations submitted by Steven Fontanazza, the Acting Ice Field Office Director and Ronald Warren, the Interim Facility Administrator of the Folkston Facility. First, Respondents point to efforts to keep the facility clean. They allege that dorms and common areas undergo "sanitization procedures" every two hours during which various surfaces, including tables, doors, sinks, and restrooms are cleaned. See Dkt. No. 69-2 ¶¶ 25, 31, 32. Food carts and food preparation areas are also cleaned regularly. Id. ¶ 26.

Detainees and staff assigned to clean certain areas are given gloves, and all detainees are given 24-hour access to soap, shampoo, and lotions. See id. ¶¶ 28-29.

Second, Respondents contend that there are efforts to reduce the spread of COVID-19 internally. They allege that staff are given masks that they are directed to wear in the Folkston Facility, and that detainees are issued new masks three times weekly. Id. ¶¶ 36-37. Individuals entering the facility are advised to stand six feet apart, and dormitory populations have been reduced in an effort to accommodate social distancing. Dkt. No. 69-2 ¶¶ 16, 48-50. Furthermore, the detainee dining hall has been closed and detainees now receive meals in their housing units. Id. ¶ 55.

Finally, Respondents allege that detainees are kept informed about COVD-19 prevention and given adequate access to medical treatment in the event there is an outbreak. Specifically, Respondents state that flyers discussing COVID-19 prevention are distributed throughout the facility. Id. ¶ 56. Administrative staff also deliver weekly addresses on prevention measures, which are presented to detainees in-person, over an intercom system, and through the detainees' tablets. Id. ¶ 57. Medical staff also offer guidance and information about COVID-19 during screenings. Id. ¶ 58. In the event medical issues arise, Respondents also allege that the facility provides twenty-four-hour access to medical

care, daily access to sick calls, and medical observation rooms. Dkt. No. 69-1 ¶ 22; see also Dkt. No. 69-2 ¶ 61.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic" remedy. Siegel v. LePore, 234 F.3d 1163, 1176-77 (11th Cir. 2000). Indeed, "[w]hen a court employs the extraordinary remedy of injunction it directs the conduct of a party, and does so with the backing of its full coercive powers." Nken v. Holder, 556 U.S. 418, 428 (2009) (internal quotations and citations omitted). A court should only exercise this power in the rarest of circumstances. For the court to grant such extraordinary relief, a movant must establish four essential elements: (1) a likelihood of success on the merits of the overall case; (2) irreparable injury; (3) the threatened injury outweighs the harm the preliminary injunction would cause the other litigants; and (4) the preliminary injunction would not be averse to the public interest. See Chavez v. Fla. SP Warden, 742 F.3d 1267, 1271 (11th Cir. 2014). An injunction is "not to be granted unless the movant clearly establish[es] the burden of persuasion as to all four elements." CBS Broad v. Echostar Commc'ns. Corp., 265 F.3d 1193, 1200 (11th Cir. 2001) (internal quotations omitted). Moreover, injunctions that do more than preserve the status quo are particularly disfavored. Powers v. Sec'y, Fla. Dep't of Corr., 691 F. App'x 581, 583 (11th Cir. 2017).

**DISCUSSION**

Petitioners contend that conditions at the Folkston Facility infringe on certain of their constitutional rights. Specifically, they allege that their continued detention during the COVID-19 pandemic constitutes impermissible punishment and deliberate indifference to a substantial risk of harm in violation of the Due Process Clause of the Fifth Amendment. They further contend that Respondents' failure to comply with CDC Guidance violates the Accardi doctrine—developed in United States ex rel. Accardi v. Shaughenessy, 347 U.S. 260 (1954) and its progeny—which they also argue infringes on their Fifth Amendment due process rights.

As an initial matter, the Court must determine whether Petitioners' claims are grounded in a cause of action. Violations of the constitution, without more, do not necessarily form a basis for relief. Instead, claims must form a recognized cause of action, whether expressed by statute or implied in the constitution.

Plaintiffs first argue that they are entitled to relief under 28 U.S.C. § 2241, the federal habeas statute. As this Court held in the April Order, however, habeas is not an appropriate mechanism for challenging conditions of confinement in the Eleventh Circuit. See Dkt. No. 32 at 10-11. Habeas actions function solely as a means to challenge the "fact or duration" of a sentence so as to secure release from confinement. See Vaz v. Skinner, 634 Fed. App'x 778, (11th Cir. 2015); see also Smith v. Southwood, 226 Fed. App'x 882,

(11th Cir. 2007). Moreover, allegations of "mistreatment in prison"—even if sufficient to establish a constitutional violation—do not entitle a claimant to release. See Gomez v. United States, 889 F.2d 1124, 1126 (11th Cir. 1990) ("[E]ven if a prisoner proves an allegation of mistreatment in prison that amounts to cruel and unusual punishment, he is not entitled to release.").

Here, Petitioners' claims are ultimately a challenge to the conditions of confinement at the Folkston Facility; that is, Petitioners contend that Respondents have not offered them adequate protection against the spread of COVID-19. However, they allege that release via habeas is appropriate where "there are no conditions of confinement that are sufficient to prevent irreparable constitutional injury." Dkt. No. 41-1 at 30 (quoting Vazquez Barrera v. Wolf, No. 4:20-cv-1241, 2020 WL 1904497, at *4 (S.D. Tex. Apr. 17, 2020).[3] Furthermore, even assuming this is an accurate statement of the law, Petitioners have not shown that they are likely to succeed on a claim that the alleged unconstitutional conditions at the Folkston Facility are

---

[3] The only authority Petitioners cite in support of this specific proposition is a recent case from the Southern District of Texas. Vazquez, 2020 WL 1904497, at *4. That decision, however, relies primarily on Preiser v. Rodriguez, a case in which state prisoners brought an action under 42 U.S.C. § 1983 challenging the state's failure to provide them with good time credits. See Preiser v. Rodriguez, 93 S. Ct. 1827, 1829 (1973). There, the plaintiffs' claims were far more suitable for habeas relief than the claims alleged here. Moreover, the Supreme Court in that case expressly declined to "explore the appropriate limits of habeas corpus as an alternative remedy to a proper action under § 1983." Id. at 1841. Petitioners have not pointed to any authority from the Eleventh Circuit holding that habeas relief is available under the circumstances alleged.

incurable. To the contrary, they point to a series of specific acts that they believe Respondents could take to help alleviate problems at the Folkston Facility. See Dkt. No. 41 at 3-7. Petitioners suggest that even with these measures in place, they would still face significant risks of exposure to COVID-19 while in detention. See Dkt. No. 74 at 15 ("Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of vulnerable individuals is a key part of a risk mitigation strategy.") (quoting Dkt. No. 4-3 ¶ 17). However, as this Court held in the April Order, "the Constitution does not require that detention facilities reduce the risk of harm to zero." Dkt. No. 32 at 12-13 (citing Williams v. Scibana, No. 04-C-349-C, 2004 U.S. Dist. LEXIS 15548, at *10 (W.D. Wis. Aug. 3, 2004). Accordingly, the Court finds that Petitioners have failed to establish a substantial likelihood of success on a cause of action under 28 U.S.C. § 2241 and will therefore deny their motion on that ground.

Alternatively, Petitioners argue that they are entitled to relief under an implied cause of action arising out of the Fifth Amendment. It is clear, however, that a Bivens action, like an action under § 1983, cannot be used as a mechanism to secure release from detention. See Abella v. Rubino, 63 F.3d 1063, 1066 (11th Cir. 1995). Petitioners vaguely argue that the implied relief they seek is not derived from Bivens but rather some other form of

implied cause of action arising out of the constitution. <u>See</u> Dkt. No. 41-1. As noted above, Petitioners also seek, in the alternative, injunctive relief modifying their conditions of confinement. Assuming, without deciding, that Petitioners have stated a viable implied cause of action under the constitution, the Court finds that Petitioners have simply not shown they are likely to succeed on the merits of their constitutional claims. The Court now turns to these specific claims.

**A. Impermissible Punishment**

Claims for impermissible or unconstitutional punishment are derived from the Fifth Amendment right to due process. In contrast to post-trial prisoners' right to be free from cruel and unusual punishment under the Eighth Amendment, pre-trial or civil detainees may not be punished at all. Therefore, restrictions or conditions which are deemed "punishment" violate the Due Process clause under the Fifth Amendment. <u>See</u> <u>Bell v. Wolfish</u>, 99 S. Ct. 1861, 1872 n.16 (1979); <u>see also</u> <u>Magluta v. Samples</u>, 375 F.3d 1269, 1273 (11th Cir. 2004) ("Due process requires that a pretrial detainee not be punished prior to a lawful conviction."). Ultimately, the question of whether restrictions or conditions constitute punishment turns on whether they are "imposed for the purpose of punishment or [are] but an incident of some other legitimate governmental purpose." <u>Bell</u>, 99 S. Ct. at 1873. Pre-trial or civil detainees seeking to show that they are being

13

punished in violation of the Due Process Clause must show either an "intent to punish" or that a condition "is not reasonably related to a legitimate goal." Magluta, 375 F.3d at 1273.

As an initial matter, the Court must determine which "restrictions or conditions" are alleged to violate the constitution. Petitioners seem to argue that the mere fact of their confinement, in light of circumstances at the Folkston Facility, constitutes punishment in violation of the Fifth Amendment. See Dkt. No. 41-1 at 20 (arguing that "Petitioners' continued detention under the current conditions at Folkston lacks a reasonable relationship to *any* legitimate governmental purpose") (emphasis in original). Specifically, they contend that the threats posed to them from exposure to COVID-19 "vastly outweigh[] . . . any purported governmental interest in Petitioners' civil confinement." Id. However, this argument misapprehends the nature of unconstitutional punishment jurisprudence. The inquiry into whether a condition amounts to punishment is not a question of whether a detainee should be detained, but rather whether there are certain aspects of detention that infringe on their constitutional rights, i.e. that constitute punishment. See Bell, 99 S. Ct. at 1871 ("We are not concerned with the initial decision to detain an accuse and the curtailment of liberty that such a decision necessarily entails.") (citing Gerstein v. Pugh, 420 U.S.

103 (1975)).[4] Indeed, it is well-settled that after the government has exercised its authority to detain a person pending trial, "it obviously is entitled to employ devices that are calculated to effectuate this detention." Id. at 1873.

Thus, the appropriate question is whether there are certain conditions *of confinement* that evince an "intent to punish" or are "not reasonably related to a legitimate goal." Magluta, 375 F.3d at 1273. Petitioners have not offered any evidence—nor do they argue—that Respondents expressly intended to punish them by failing to take adequate measures to protect them from COVID-19. Instead, Petitioners rest on the argument that the Folkston Facility's response to COVID-19—or more specifically, a lack thereof—lacks a legitimate governmental purpose. In support, they point to evidence from a range of sources that they contend show deficiencies at the Folkston Facility. While this evidence suggests a possibility of success on the merits, it falls short of satisfying Petitioners' burden that they are likely to succeed. See Nken v. Holder, 556 U.S. 418, 434 (2009) (finding that "[m]ore than a mere possibility of relief is required" to satisfy the first element of injunctive relief) (quotations omitted).

---

[4] In reaching this conclusion, the Court does not intend to foreclose the possibility that under some set of facts the circumstances of civil or pre-trial detention could be so extreme or irreparable that the fact of confinement itself is the "condition" that constitutes punishment. However, as discussed *supra*, that is not the set of facts before the Court here.

Most significantly, Petitioners rely on their own declarations describing experiences in the Folkston Facility. These declarations include, inter alia, allegations of limited social distancing, dkt. no. 37-6 at 4-5, 11; dkt. no. 37-7 at 5; dkt. no. 37-8 at 5; dkt. no. 37-9 at 3-4; dkt. no. 37-10 at 5; dkt. no. 73-10 at 62, limited access to cleaning supplies, dkt. no. 37-6 at 5; dkt. no. 37-7 at 4-5; dkt. no. 37-8 at 5; dkt. no. 37-9 at 3; dkt. no. 37-10 at 6, deficient efforts to keep the facility clean, dkt. no. 37-6 at 6; dkt. no. 37-7 at 6; dkt. no. 37-8 at 4; dkt. no. 73-10 at 61, and a general failure to take measure to keep coronavirus from entering and spread through the facility, dkt. no. 37-6 at 9; dkt. no. 37-7 at 6; dkt. no. 37-8 at 3; dkt. no. 37-10 at 4. Many of these descriptions contrast sharply with declarations from both the Acting ICE Field Office Director and the Interim Facility Administrator for the Folkston Facility identifying a number of measures taken to protect detainees from exposure to COVID-19. Dkt. Nos. 69-1, 69-2. Such measures include screening and intake procedures, enhanced cleaning regimens, social distancing policies, and efforts to educate detainees on COVID-19 prevention. Id. However, the mere fact that Petitioners have offered a conflicting version of the facts does not entitle them to preliminary relief. See R. Miller Architecture, Inc. v. Edgington Enterprises, Inc., No. 6:06-cv-871, at *4 (M.D. Fla. Aug. 3, 2006) (concluding that disputed facts militated against a

finding of a likelihood of success); see also Tradebank
International Franchising Corporation v. Florida Barter Exhcnage,
LLC, No. 1:12-cv-2810, 2013 WL 12122427 at *4 (N.D. Ga. Jan 7,
2013) (same). Rather, Petitioners must provide enough evidence to
show that their version of the facts is likely to prevail at trial.[5]
That they cannot do.

At this stage, Petitioners' evidence leaves much room for
doubt. As Respondents point out, some of the detainee declarations
cited in support of Petitioners' motion concede that, at least to
some degree, the Folkston Facility has incorporated measures to
protect against the spread of COVID-19. See Dkt. No. 69 at 7-9.[6]
Furthermore, many of the detainee declarations rely on speculation
and hearsay.[7] Detainees tend to make assumptions about who has

---

[5] Petitioners point to an inconsistency in the Warren and Fontanazza
declarations, noting that the former claims *all* incoming detainees are placed
into a fourteen-day cohort while the latter claims that only symptomatic
detainees are placed into such a cohort. In his deposition, Warren discusses
the automatic 14-day cohort in some detail, suggesting that his view more
accurately captures the Folkston Facility's screening procedure. See Dkt. No.
81-2 at 11. Furthermore, Stephen Davis, the Health Service Administrator,
testified as to his understanding that new arrivals at the facility are
quarantined for fourteen days. Dkt. No. 73-13 at 5. Regardless, the discrepancy
between the Warren and Fontanazza depositions does not necessarily undermine
the credibility of Respondents' evidence such as to allow the Court to determine
that Petitioners are likely to prevail at trial. This is particularly true
where, as discussed below, there are also holes in Petitioners' evidence.
[6] Petitioners argue that these concessions are cherry-picked from the record
and overlook "vastly more evidence from Petitioners that they have continued to
observe and experience first-hand violations and inconsistencies around CDC-
recommend practices related to social distancing." Dkt. No. 74 at 4. This may
be true. Indeed, the weight of Petitioners' evidence is that the Folkston
Facility is deficient in their efforts to prevent the spread of COVID-19.
However, the fact that there is some equivocation in Petitioners' evidence is
significant in determining whether Petitioners are likely to prevail on their
claims, particularly where declarations from ICE officials categorically insist
that they are taking all recommended measures to protect detainees.
[7] Admittedly, courts may rely on hearsay or other inadmissible forms of evidence
at the preliminary injunction stage if it is "appropriate given the character

17

potentially been exposed to COVID-19 and their corresponding risk of exposure based on conjecture or conversations with unidentified inmates or staff. See, e.g., Dkt. No. 73-10 at 63 (describing having learned about people with COVID-19 from a detainee who had been informed about it from another detainee); Dkt. No. 37-8 at 3-4 (stating that certain detainees were new "because they had their bags of belongings with them," and referring to an "officer" who indicated "they were not going to stop" bringing in new people); Dkt. No. 37-9 at 4 (stating that they "heard that kitchen staff might be infected with COVID-19 or afraid to work because of COVID-19"); Dkt. No. 37-10 at 5 (stating their "understanding" that detainees in a certain unit had COVID-19 and that "we learned" that detainees from that unit had cleaned their new dorm). They also make generalizations about facility-wide conditions based on limited or isolated information. See Dkt. No. 73-10 at 70 ("I see some detained people, guards and staff using face masks, but not all of them."); see also Dkt. No. 37-5 at 4 ("To my knowledge, no detainees have been quarantined and new detainees are bring brought into Folkston without being quarantined").[8]

---

and objectives of the injunctive proceeding." Levi Strauss & Co. v. Sunrise Intern. Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995) (quoting Asseo v. Pan American Grain Company, 805 F.2d 23, 26 (1st Cir. 1986)). However, this does not necessarily mean courts must ignore indicia that this evidence is unreliable.

[8] This is not to suggest that Petitioners' evidence lacks all credibility, nor does the Court find that a reasonable jury could not disagree with the Court's view of the evidence. Instead, the Court merely finds that the evidence presented at this stage is not sufficient to satisfy the Petitioners' burden under the first element of the preliminary injunction standard to establish

Petitioners also append to their motion declarations from Homer Venters, M.D., a physician and epidemiologist, who opines that the Folkston Facility is not adequately protecting detainees from COVID-19. See Dkt. Nos. 41-3, 73-10. However, Dr. Venters' first declaration is of limited value to Petitioners as it primarily addresses ICE's nationwide response to COVID-19 rather than offering any particularized assessment of the Folkston Facility. See, e.g., Dkt. No. 41-3 at 5 (identifying materials that contributed to Dr. Venters' opinion, including ICE memorandums, guidance, and response requirements). To be sure, Respondents' evidence suggests that at least some of the deficiencies that Dr. Venters attributes broadly to ICE facilities nationwide are not necessarily problems at the Folkston Facility. Compare id. at 6-7 (identifying the importance of screening "for active symptoms including fever and known sick contacts of any type every time a person, whether a staff member or detained person, enters an ICE facility."), with Dkt. No. 69-2 at 4-5 (stating that essential visitors and detainees being processed must complete a temperature check and screening questionnaire and that anyone who poses a risk is not permitted into the facility's general population).

---

that measures to protect detainees against COVID-19 are so deficient as to constitute punishment.

Dr. Venters' second declaration, though more specific to the Folkston Facility, relies heavily on detainee declarations as the factual basis for his opinions. See Dkt. No. 73-10 at 21 ("In order to assess the adequacy of the COVID-19 response inside the Folkston Detention Center, I relied on the affidavits of people currently detained at the detention center."). As mentioned above, however, there are several aspects of the detainees' declarations that call into question whether they accurately characterize conditions at the Folkston Facility.

Furthermore, even to the extent that Dr. Venters' is working with accurate facts, his declarations opine on an ideal response to Coronavirus, rather than a constitutionally adequate one. Indeed, much of his focus is on whether ICE and the Folkston Facility are complying with CDC Guidance. See e.g., Dkt. No. 41-3 at 7 (critiquing ICE for mandating only one daily check for symptomatic or quarantined individuals as opposed to the two checks recommended by the CDC); see also Dkt. No. 73-10 (identifying questions assessed as part of the opinion analysis, two of which center on whether practices conform to CDC guidelines). CDC Guidance, however, does not define the standard for constitutional adequacy. See Swain v. Junior, No. 20-cv-11622, 2020 WL 3167628, at *8 (11th Cir. June 15, 2020) (finding that CDC Guidance was "not determinative" in addressing the question of whether civil detainees were offered constitutionally sufficient protection

against COVDID-19). Nor is the standard perfection. See Matos v. Vega, No. 20-CIV-60784, 2020 WL 2298775, at *10 (S.D. Fla. May 6, 2020) (finding that inherent shortcomings in a detention facility's ability to contain a communicable disease "do not automatically translate into a constitutional violation.")

Ultimately, decisions about whether a restriction or condition is merited are "peculiarly within the province and professional expertise of corrections officials." Bell, 99 S. Ct. at 1875 n. 23. "In the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Id. Therefore, the Court finds that neither the detainees' declarations nor Dr. Venters' declarations are sufficient to merit the conclusion that Petitioners' are likely to prevail on the claim that their conditions of confinement constitute punishment.

Petitioners point to other miscellaneous pieces of evidence to suggest that conditions at the Folkston Facility are not adequate to protect them from COVID-19. However, much—if not all—of this evidence is again speculative or extrapolates facility-wide deficiencies from limited data. For example, Petitioners contend that out of 330 screening forms for new detainees arriving at the facility, only two were flagged as COVID-19 risks. See Dkt. No. 81 at 2. They argue that this "calls into question the

reliability and effectiveness of the screening forms." Id.
Petitioners do not offer any statistics or data to suggest that
this number is an error, much less that the number is so
inconsistent with existing data as to call for preliminary relief.[9]

Petitioners also piece together data on detainee intakes and
facility cohorts from May 20 to June 1 to conclude that there were
twenty-eight intakes who were not placed in cohorts for fourteen
days in accordance with CDC Guidance. See Dkt. No. 81 at 4-5
(citing Dkt. No. 73-2 at 66-70, 89). As Respondents point out,
however, the cohort data on which Petitioners rely is from June 3,
which is 14 days beyond the intake date of the six detainees
entering the facility on May 20.[10] Therefore, while there is some

---

[9] Petitioners also seem to have combed through hundreds of pages of screening
forms in search of any aberrations that would suggest problems with the Folkston
Facility's intake process. They then deduce from any errors they find that there
are gross deficiencies in Folkston's screening measures. See, e.g., Dkt. No. 81
at 3 (identifying isolated documentation defects as an indication that the
Folkston Facility "fails to implement infection containment measures for new
intakes who are documented as presenting risk factors for COVID infection");
see id. at 2 (indicating that a discrepancy in the number of screening forms
versus the number of intakes "calls into question the reliability and
effectiveness of the screening forms"). Even assuming Petitioners are painting
an accurate picture of the facts—which Respondents call into doubt in their
supplemental briefing—errors or oversights in the screening process are not
dispositive in resolving the question of whether Petitioners have been deprived
of constitutionally adequate protection. Nor is it surprising that there may be
some hiccups in the screening process as facility personnel respond to new and
evolving circumstances. Ultimately, Petitioners may be able to convince a jury
that these problems amount to more than inadvertent oversights. However, in
light of the evidence before the Court at this stage, the Court cannot find
that Petitioners are entitled to preliminary relief.
[10] Respondents also conclude that by June 3 the mandatory cohort period would
have also expired for the fifteen detainees who entered the Folkston Facility
on May 21. Dkt. No. 86 at 10. Whether this is true depends partly on when
Respondents begin to run the fourteen-day clock on detainees entering the
facility. Nevertheless, it is sufficient to state here that the discrepancy
between detainee intakes and detainees in cohort is less significant than what
was cited by Petitioners.

discrepancy between intakes and cohorts, it is not as large as Petitioners allege. Furthermore, the remaining discrepancy could be explained by the large number of outgoing transfers between May 20 and June 1. See Dkt. No. 73-2 at 80-88. Indeed, many—if not all—of the detainees brought into the facility between those dates could have also gone out between those dates as well.[11]

Petitioners also invest much ink protesting the number of transfers into the Folkston Facility despite what they characterize as CDC Guidance advising against transferring detainees unnecessarily. Petitioners argue that Respondents have "not presented evidence that they have made *any* attempts to limit or restrict transfers in a meaningful way." Dkt. No. 81 at 6 (emphasis in original). However, it is not Respondents' burden—at least at this stage—to do so. Furthermore, as Respondents point out, Petitioners offer no point of reference for determining whether total transfers are lower than their pre-pandemic numbers. To the contrary, Petitioners' analysis of the Folkston Facility's population and transfer data appears to show that from late April 2020 to early June 2020, outgoing detainees from the Folkston Facility exceed incoming detainees and the overall population of

---

[11] Petitioners also complain that the Folkston Facility allows new intakes to join ongoing cohorts, which they contend infringes on CDC Guidance. Dkt. No. 81 at 5. In support, they rely on deposition testimony from Ronald Warren, the Folkston Facility Administrator. Id. (citing Dkt. No. 81-2 at 12). However, Warren testified only that this practice was "a possibility" and suggested that the number of pods available for cohorts was sufficient so as not to necessitate the practice at that time. See Dkt. No. 81-2 at 12.

the facility decreased. Dkt. Nos. 87-7, 87-8.[12] Further, Petitioners fail to show, even if Respondents did not reduce incoming transfers, that those transfers were not "necessary" under CDC Guidance. In fact, Petitioners seemingly concede Respondents' position that about half of incoming transfers from late April to early June were "new arrests" that Respondents lacked discretion to decline. See DKt. No. 81 at 6. Petitioners do not offer any evidence concerning whether the remaining transfers were necessary. Instead, they rely on detainee declarations for the proposition that new people were being brought into the facility. See Dkt. No. 81 at 5. This is not sufficient to show that incoming transfers violated CDC Guidance, much less that they lacked a legitimate governmental purpose.

Petitioners argue that Respondents have failed to conform to CDC Guidance concerning social distancing because of the high population densities in the Folkston Facility generally and in the housing units specifically. Much of the parties' debate on this topic concerns the accuracy of representations made by Respondents concerning the percentage of the facility's capacity that has been filled. Regardless of this dispute, Petitioners concede that no individual unit is actually filled to capacity and that nearly half of them are at less than fifty percent full. See Dkt. No. 81-

---

[12] Though CDC Guidance advises against unnecessary transfers generally, incoming transfers are the only ones that are alleged to pose a risk to Petitioners.

5 at 2. Petitioners, however, point to a particular unit that is at almost eighty-five percent capacity and allege that to maintain the recommended six feet of separation, detainees in that unit would "have to stand practically perfectly still." Dkt. No. 81 at 8. Respondents counter that space in the facility has been allocated to prioritize the availability of intake cohort units. Dkt. No. 86 at 11. Petitioners' chart depicting the percentage capacity of units substantiates this contention, showing that no intake cohort or quarantine unit is more than thirty-four percent full. See Dkt. No. 81-5 at 2.[13] Accordingly, the Court finds that the evidence as it stands now fails to show that the Respondents' allocation of space lacks a legitimate purpose or was otherwise constitutionally inadequate.

Finally, Petitioners argue that Respondents have not adequately tested the detained population at the Folkston Facility. Dkt. No. 81 at 10. Specifically, they complain that from April 20 to June 2, only six individuals at the facility have been tested. See Dkt. No. 81 (citing Dkt. No. 73 at 53-54). However,

---

[13] Petitioners contend that regardless of the capacity of the individual quarters, "detainees must still share common areas such as showers and tables and communication devices . . . thereby preventing detainees from socially distancing." Dkt. No. 86 at 9. However, Petitioners are merely describing conditions intrinsic to a detention facility generally, rather than some punitive measure imposed by the Folkston Facility. As explained above, the question before the Court is not whether Respondents may detain Petitioners but whether the conditions of their detention amount to punishment. See Bell, 441 U.S. at 533. Respondents cannot infringe on a detainee's constitutional rights by failing to do the impossible. See Swain, 2020 WL 3167628, at *7.

Petitioners offer little explanation as to why six tests performed over roughly one and one-half months is so grossly inadequate as to amount to unconstitutional punishment. As Respondents point out, these six tests do not necessarily represent the universe of testing completed by the Folkston Facility during the coronavirus pandemic, but rather the number of tests performed during that relatively narrow window of time.

Petitioners also offer little evidence about specific testing that the Folkston Facility failed to perform. Petitioners rely primarily on statements by detainees who allegedly observed people with "symptoms" that are not being tested. For example, one detainee said that he "observed detainees coughing" and that they were not quarantined or tested. Dkt. No. 37-5 at 4-5. Another stated that they "cough and [their] bones ache" but are not given medical attention. DKt. No. 71-3 at 3. Admittedly, some of the symptoms described by detainees are less innocuous, such as breathing issues. See, e.g. Dkt. No. 71-2 at 3. However, even in these cases, descriptions tend to be exceedingly vague and do not necessarily substantiate that testing was merited, at least without more context. See, e.g., Dkt. No. 71-3 at 3 ("I think I have the covid-19 virus because I am struggling to breathe."). The Court simply cannot find that Respondents are undertesting at the Folkston Facility because they do not perform a test on every detainee who coughs. Nor can the Court find that the constitution

compels Respondents to test every detainee who subjectively perceives themselves to have symptoms. See Bell, 99 S. Ct. at 1875 n.23 (finding that courts should defer to the judgment of corrections officials absent "substantial evidence" that those officials are misrepresenting the need to respond in the way that they do). Rather, facility officials must exercise reasonable discretion in implementing testing procedures such that those procedures do not lack a legitimate purpose.

## B. Deliberate Indifference

Next, Petitioners contend that Respondents have infringed on their due process rights by acting with deliberate indifference to a serious medical need. As a threshold matter, the Court must determine the appropriate standard for assessing a deliberate indifference claim under the Fifth Amendment. Under the Eighth Amendment, a deliberate indifference claim includes both an objective and subjective component:

> First, the inmate must establish 'an objectively serious medical need'—that is, 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention'—that, 'if left unattended, poses a substantial risk of serious harm'. . . Second, the inmate must prove that prison officials acted with deliberate indifference to that need by showing (1) that they had 'subjective knowledge of a risk of serious harm' and (2) that the 'disregard[ed]' that risk (3) by conduct that was 'more than mere negligence.'

Keyohane v. Florida Department of Corrections Secretary, 952 F.3d 1257, 1266 (11th Cir .2020) (quoting Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).

Petitioners argue that civil detainees "should not have to satisfy the Eighth Amendment's requirement that a prison official have subjective knowledge of a substantial risk in order to establish a Fifth Amendment violation." Dkt. No. 41-1 at 22 n.34. They allege that while the "Eleventh Circuit has not squarely addressed this issue," two other circuits have reached this finding. Id. (citing Gordon v. County of Orange, 888 F.3d 1118, 1124-25 (9th Cir. 2018) and Darnell v. Pineiro, 849 F.3d 17, 32-36 (2d Cir. 2017)). Petitioners' characterization is not entirely accurate. In at least one unpublished opinion, the Eleventh Circuit has expressly held that "[t]he standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth Amendment and the Fifth Amendment's Due Process Clause." Daniel v. U.S. Marshall Service, 188 Fed. App'x 954, (11th Cir. 2006) (961-62) (citing Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000). Moreover, the Eleventh Circuit has also held in multiple published opinions that deliberate indifference claims under the Fourteenth and Eighth Amendments are analyzed under the same standard. See Taylor v. Adams, 221 F.3d 1254, 1257 n.3 (11th Cir. 2000); see also Marsh v. Butler County, Ala., 268 F.3d 1014, 1024 n.5 (11th Cir. 2001) ("We accept our precedents treating the

[Eighth and Fourteenth] Amendments as the same in the context of incarceration.") (abrogated on other grounds in Bell Atlantic Corporation v. Twombly, 127 S. Ct. 1995 (2007)). The Court sees no reason to depart from the clear trend in this circuit to analyze deliberate indifference claims the same regardless of whether the claim is raised by pre or post-trial detainees.[14]

Therefore, having determined that Fifth Amendment deliberate indifference claims are assessed under the same standard as their Eighth Amendment counterparts, the Court must assess whether Petitioners have demonstrated a substantial likelihood of success in satisfying that standard. The Court finds that they have not. First, the Court finds that Respondents have not disregarded a risk of harm to Petitioners because, for the reasons discussed above, the evidence at this stage does not establish that conditions at the Folkston Facility are deficient in the manner described by Petitioners. Respondents' evidence suggests that they are taking ample measures to protect detainees from the spread of COVID-19, including screening and intake procedures, enhanced

---

[14] The only circuit court cases that Petitioners cite on this topic both stand for the proposition that the Eighth and *Fourteenth* Amendments rely on different standards for assessing deliberate indifference claims, see Gordon, 888 F.3d 1118 at 1124 ("[W]e hold that claims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard.") (quotation and citation omitted); see also Darnell v. Pineiro, 849 F.3d 17, 35 (finding that the subjective prong of a deliberate indifference claim is "defined objectively" under the Fourteenth Amendment), a proposition that—as discussed above—has been rejected by binding precedent in this circuit.

cleaning regimens, social distancing policies, and efforts to educate detainees on COVID-19 prevention. As explained, the mere fact that Petitioners have offered a conflicting version of facts does not necessarily entitle them to relief.

Moreover, even to the extent Petitioners have identified more protective measures that the Folkston Facility could adopt, Respondents' decision not to implement those measures does not necessarily render them indifferent to Petitioners' medical needs. Indeed, the Fifth Amendment "doesn't require that the medical care provided . . . be 'perfect, the best obtainable, or even very good.'" Keohane v. Florida Dep't of Corr. Secretary, 952 F.3d 1257, 1266 (11th Cir. 2020) (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)). Instead, medical treatment—or lack thereof—constitutes deliberate indifference "only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. Though Petitioners assert that more should be done, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the . . . course of treatment" is not sufficient to support a claim for deliberate indifference. Keohane, 952 F.3d at 1266. Here, Respondents' medical decisions and general treatment of Petitioners with respect to COVID-19 does not rise to the high threshold necessary to show deliberate

indifference, at least not as it concerns the standard necessary on a motion for a preliminary injunction.

## C. Accardi Doctrine

Finally, Petitioners contend that Respondents violated their constitutional rights under the Accardi doctrine because despite the PBNDS requiring ICE to conform to directives from the CDC, Respondents have failed to bring the Folkston Facility in compliance with CDC Guidance. It is well-settled that administrative agencies must "comply with the procedural requirements imposed by statute." Romano-Murphy v. C.I.R., 816 F.3d 707, 720 (11th Cir. 2016) (quoting Gonzalez v. Reno, 212 F.3d 1338, 1349 (11th Cir. 2000)). However, in Accardi, the Supreme Court extended this principal, finding that agencies must also comply with their own internal regulations. See 347 U.S. 260, 266-67.

In Accardi, the petitioner, a deportable immigrant, filed a habeas petition after the Board of Immigration Appeals (the "Board") declined to suspend his deportation. See id. at 262-64. The petitioner argued that prior to the Board's decision, the Attorney General circulated a list of "unsavory characters" that included the petitioner's name. Id. at 262. This, according to the Petitioner, had prejudiced the Board, which pursuant to agency regulations, was supposed to rely on its independent judgment in making its determination. Id. at 262, 266. The Supreme Court

31

agreed, finding that so long as such regulations were in place, "the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner." Id. at 267.

Since its inception, the scope of Accardi has proven to be elusive. Early cases suggested that the doctrine was derived from the due process clause and implicated only where an agency deprived someone of a procedural right. See Bridges v. Wixon, 326 U.S. 135, 153 (1945) (finding that an agency's obligation to follow its own rules is designed to safeguard against "essentially unfair procedures.")[15]; see also Accardi,347 U.S. at 265-66 (finding that an agency may not deny someone of a procedural right guaranteed to them by its own regulations). However, later decisions suggested that Accardi claims might emanate from somewhere else, such as the Administrative Procedure Act (the "APA"). See United States v. Caceres, 440 U.S. 741, 752 (rejecting an Accardi-like claim, in part, because it was not a case "in which the Due Process Clause is implicated because an individual has reasonably relied on agency regulations promulgated for his guidance or benefit."); see also Vitarelli v. Seaton, 359 U.S. 535, 547 (1959) (describing the Accardi doctrine as a "judicially evolved rule of administrative law.") (Frankfurter, J. concurring); see also Aerial Banners, Inc.

---

[15] Though Bridges predates Accardi, it articulates a similar principal and can be seen as a precursor to the doctrine itself. See Thomas W. Merrill, *The Accardi Principle*, 74 Geo. Wash. L. Rev. 569, 574 (2006) (describing Bridges as a pre-Accardi case that contributed to the development of the Accardi doctrine).

v. F.A.A., 547 F.3d 1257, 1260 (11th Cir. 2008) ("An agency may also act arbitrarily and capriciously by failing to follow its own regulations and procedures."). At least one scholar postulates that Accardi may have dual purposes, "one grounded in due process, the other in the APA." See Thomas W. Merrill, *The Accardi Principle*, 74 Geo. Wash. L. Rev. 569, 581 (2006) (citing United States v. Caceres, 440 U.S. 741 (1979)).

Fortunately, the Court need not wade into this murky debate. As explained above, the evidence presented by both parties shows that there are factual disputes concerning whether Respondents violated CDC Guidance, but it does not resolve the issue clearly in favor of Petitioners. The evidence arguably suggests technical, inadvertent violations of CDC Guidance, such as mistakes on screening forms. However, even to the extent Accardi has constitutional implications—on which Petitioners rely here—they are not implicated where agency violations are, at worst, technical or de minimis. See First Alabama Bank, N.A. v. U.S., 981 F.2d 1226, 1230 n.5 (11th Cir. 1993) (finding that courts may force agencies to follow internal regulations where they would affect "substantive" individual rights). Indeed, this Court simply cannot find that every administrative oversight by an administrative agency gives rise to a constitutional claim under Accardi.

Moreover, CDC Guidance itself suggests that it was not intended to be followed with rigid precision. In bold letters on

the first page, it states, "The Guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." See CDC Guidance at 1. This principal is reiterated throughout the document. See id. at 2 ("Where relevant, community-focused guidance documents are referenced in this document and should be monitored regularly for updates, but they may require adaptation for correctional and detention settings."); see id. at 3 ("At this time, different facility types . . . and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility."); id. at 23 ("Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect operations and custody needs."). That Respondents' transfer policies, quarantine procedures, or other protective measures might not conform absolutely with CDC Guidance is not a basis to conclude that it violates that guidance. Ultimately, the evidence at this stage suggests that Respondents are making reasonable efforts to comply with CDC Guidance and reduce risks that detainees are exposed to COVID-19.

For these reasons, the Court cannot find that Petitioners are likely to succeed on a constitutional claim, whether under Accardi or otherwise. This decision is not meant to suggest that the

evidence, especially after it is more fully developed, could be found by a jury to be sufficient to establish a constitutional violation. Nor is the Court's decision here meant to be a finding on any of Respondents' arguments in its pending Motion to Dismiss. Rather, the Court finds only that at this stage, and under Petitioners' burden, the evidence before the Court is not adequate to merit injunctive relief.

**CONCLUSION**

For the reasons above, Petitioners second Motion for a Preliminary Injunction and Emergency Writ of Habeas Corpus is **DENIED**. Respondents' evidentiary objections raised at the hearing are **OVERRULED as moot** insofar as they concern the Petitioners' motion for preliminary relief. Such objections may be re-urged, if relevant, in a subsequent motion *in limine*.


**SO ORDERED**, this 8th day of July, 2020.


_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA